UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH DUANE ARLINE, JR., | No.  2:11-cv-3414 WBS KJN P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| R. GOWER, et al, | |
| Defendant. | |

I.  Introduction

Plaintiff is a state prisoner proceeding without counsel.  This action proceeds on plaintiff's first amended complaint filed January 17, 2012.  (ECF No. 15.)  Plaintiff contends that because a modified program was implemented on February 19, 2011, and continued through May 13, 2011, without alternative provision of outdoor exercise, plaintiff's Eighth Amendment rights were violated because he was required to remain in his cell twenty-four hours a day for 84 days. Defendants' motion for summary judgment is before the court.  Plaintiff filed an opposition; defendants filed a reply.  As set forth more fully below, the undersigned finds that defendants are entitled to qualified immunity, and therefore recommends that defendants' motion for summary judgment be granted.

////

////

1

II. Defendant's Motion for Summary Judgment

Defendants move for summary judgment on the grounds that defendants were not deliberately indifferent to plaintiff's rights under the Eighth Amendment; defendants did not cause plaintiff's alleged injuries under 42 U.S.C. § 1983; and defendants are entitled to qualified immunity because reasonable officials in defendants' positions could have thought that their conduct was lawful.

A. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[1]

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

---

[1]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10, 2010. However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule 56, "[t]he standard for granting summary judgment remains unchanged."

1   "[A] complete failure of proof concerning an essential element of the nonmoving party's case

2   necessarily renders all other facts immaterial."  Id. at 323.

3        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

4   the opposing party to establish that a genuine issue as to any material fact actually exists.  See

5   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

6   establish the existence of such a factual dispute, the opposing party may not rely upon the

7   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

8   form of affidavits, and/or admissible discovery material in support of its contention that such a

9   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

10  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

11  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

12  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

13  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

14  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

15  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

16  1564, 1575 (9th Cir. 1990).

17       In the endeavor to establish the existence of a factual dispute, the opposing party need not

18  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

19  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

20  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

21  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

22  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

23  amendments).

24       In resolving a summary judgment motion, the court examines the pleadings, depositions,

25  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

26  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

27  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

28  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

1  are not drawn out of the air, and it is the opposing party's obligation to produce a factual

2  predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

3  Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

4  demonstrate a genuine issue, the opposing party "must do more than simply show that there is

5  some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

6  not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

7  trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

8       By contemporaneous notice provided on November 1, 2013 (ECF No. 44-9), plaintiff was

9  advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal

10  Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

11  Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

12       B.  Facts[2]

13       1.  At all relevant times, plaintiff was in the custody of the California Department of

14  Corrections and Rehabilitation ("CDCR"), and housed at High Desert State Prison ("HDSP").

15       2.  Defendant Gower served as the Chief Deputy Warden at HDSP from December 2008

16  to November 2011.  During the modified program at issue, defendant Gower attended daily

17  meetings with Warden McDonald, where Gower provided updates and advice concerning the

18  modified program.  Defendant Gower also reviewed and denied plaintiff's related inmate

19  grievance at the second level of administrative review.

20       3.  At all relevant times, defendant Davey served as the Associate Warden for Complex II

21  at HDSP, and oversaw custody operations in Facility C and other areas of the prison.  Like

22  defendant Gower, defendant Davey also attended daily briefings with Warden McDonald,

23  where he provided updates and advice concerning the modified program.  Defendant Davey also

24  reviewed and denied plaintiff's related grievance at the first level of administrative review.

25  ////

26

27  ───────────────

28  [2]  For purposes of the instant motion for summary judgment, the court finds the following facts
undisputed.  As noted by defendants, plaintiff submitted no evidence with his opposition, other
than his own personal declaration, to support his opposition to the motion.

4. At all relevant times, defendant Hitt worked as a Correctional Lieutenant on Facility C. Defendant Hitt attended several of the Warden's weekly modified program meetings, where he briefed the Warden on the progress of the investigation, the efforts at returning Facility C to normal programming, and whether any changes to the modified program order were appropriate in light of security conditions at the time. Defendant Hitt also interviewed plaintiff in connection with his inmate grievance at the second level of administrative review.

5. Defendant Speers worked as a Correctional Sergeant on Facility C at all relevant times. However, defendant Speers was not a member of the Warden's executive staff, and he did not attend any of the Warden's weekly meetings at any point during the modified program period at issue here. Defendant Speers did not provide the Warden or any member of his executive staff with input regarding the modified program or the related investigation. Defendant Speers interviewed plaintiff in connection with his inmate grievance at the first level of review.

6. Warden McDonald, who is not named as a defendant, had sole decision-making authority to implement, continue, adjust, or end a modified program at HDSP at all relevant times.[3] Throughout the modified program, Warden McDonald attended numerous weekly threat assessment meetings in which he and his staff discussed the modified program, the status of the investigation, and the threats to safety and security in Facility C and HDSP generally. In addition, every morning Warden McDonald held smaller, informal meetings with members of his executive staff, including defendants Gower and Davey, during which they discussed the plan of the day. (ECF No. 44-7 at 8-9.) Warden McDonald insisted that Facility Captain Peddicord, the lead Facility C Captain, attend these daily executive staff briefings. Throughout the modified program at issue here, Captain Peddicord briefed the morning meeting group on each significant event as it pertained to the investigation, newly discovered threats, and steps taken to safely return Facility C to normal programming. (ECF No. 44-7 at 9.) Warden McDonald declared that he relied on the investigations, analysis, and opinions of his staff. (ECF No. 44-7 at 3.)

---

[3]  In his statement of facts, plaintiff denies that the Warden had sole decision-making authority. (ECF No. 54-1 at 24-25.) However, plaintiff did not cite to any evidence in support of such denial, and fails to demonstrate that this denial is based on his own personal knowledge.

7.  Normal programming at a prison means inmates attend work and education programs; have regular visiting, canteen, and telephone privileges; can attend the law library and religious services; and are released to the yard for recreation in large groups according to their yard schedule.  (ECF No. 44-7 at 4.)

8.  During normal programming, about 130 inmates at a time were allowed access to one of Facility C's two recreation yards for outdoor exercise.  (ECF Nos. 44-4 at 9-10; 44-7 at 4.)

9.  A modified program typically involves the suspension of various programs and services for a specific group of inmates or a specific part of a facility.   (ECF No. 44-7 at 4.)

10.  Modified programs are necessary when correctional staff discover evidence or receive information that violence or disruptions are being planned by some inmates against other inmates or staff, or that there exists a serious threat to institutional security or the safety of inmates and staff.  (ECF No. 44-7 at 4.)

11.  During a modified program, correctional staff must deliver all meals to each inmate's cell, most work assignments are suspended, and inmates must be escorted to showers and medical appointments.  (ECF No. 44-7 at 7.)

12.  It is more difficult, labor intensive, and expensive to operate a prison during a modified program.  (ECF No. 44-7 at 7.)

13.  CDCR's policy is to return to normal programming as soon as it is safe to do so. (ECF No. 44-7 at 6-7.)

14.  On February 19, 2011, an African-American prisoner attempted to murder a correctional officer in HDSP's Facility C.  As the officer was conducting a clothed body search, the inmate began striking the officer about the neck and torso area with an inmate-manufactured weapon.  (ECF No. 44-7 at 1-2.)

15.  During the attack, numerous African-American inmates refused orders to "get down" and were seen throwing weapons underneath cell doors within the section.  (ECF No. 44-7 at 2.)

16.  Warden McDonald immediately placed all African-American general population inmates at HDSP on modified program following the attempted murder.  (ECF No. 44-7 at 1-2.)

17.  This order was due to the magnitude of the incident and the unknown risk of additional violence.  (ECF No. 44-7 at 2.)

18.  While inmate-on-inmate violence is regrettably common in prison, attacks on staff are unusual, and an attempted murder on staff is an extraordinary event, even by prison standards. (ECF No. 44-7 at 2.)

19.  Nearly all inmate privileges were restricted, including outdoor recreation, dayroom activities, canteen, phone calls, and visiting, among others.  (ECF No. 44-7 at 5, 18-22.)

20.  After the February 19, 2011 attack, correctional staff began a massive investigation that spanned months, trying to determine the attempted murder's causes, as well as the potential for additional violence directed at staff and/or other inmates.  (ECF No. 44-7 at 9.)

21.  In the course of the investigation, staff discovered dozens of additional security threats.  Some threats were later confirmed, and some were not, but all required further investigation, which took time.  (ECF No. 44-7 at 2.)

22.  During a modified program, the investigation can be delayed when weapons are discovered because staff must determine where the weapons came from, how they were made, when they were gathered, and their intended targets.

23.  During the investigation in this case, staff discovered a total of 27 inmate-manufactured weapons and other metal stock (which can be used to make weapons), as well as inmate kites (covert notes), and other dangerous contraband.

24.  About a week after the February 19, 2011 attack, investigating staff determined that the security threat was limited to Facility C.  (ECF No. 44-7 at 9.)

25.  On February 28, 2011, Warden McDonald lifted the modified program's restrictions on the general population inmates housed in Facilities A and D, and the program remained in effect for Facility C's inmate population alone.  (ECF No. 44-7 at 9.)

26.  In March of 2011, additional investigation suggested that the attempted murder may not have been part of a larger conspiracy to assault correctional staff, but rather, that the offending inmate had acted alone.  (ECF No. 44-7 at 9.)

////

7

27.  Nonetheless, the additional information also revealed that there was ongoing tension between Facility C's Bloods and Crips, and that it was unsafe to release members of the two disruptive groups into a common yard.[4]  Because African-American inmates' gang and disruptive group status can be far more difficult to ascertain than for other general population inmates, Warden McDonald did not think that it was safe to release any African-American inmates into a shared space until further investigation confirmed that it was safe to do so.  (ECF No. 44-7 at 9.)

28.  Intelligence also revealed that the tension was not limited to members of the Blood and Crip disruptive groups, but that the unrest included members of the Kumi 415 (an African-American disruptive group from the Bay Area), as well as Facility C's non-affiliated African-American inmates.

29.  On March 23, 2011, confidential information was obtained from two independent sources regarding weapons being hidden in specific cell door frames in Facility C.  (ECF No. 44-7 at 10.)

30.  Staff conducted searches in response, and ten weapons and other metal stock (which can be used to make weapons) were recovered.  (ECF No. 44-7 at 10.)

31.  Due to the number of weapons recovered, the investigation was placed on a hold while all remaining cells were searched, and while the door frames were repaired.  (ECF No. 44-7 at 10.)

32.  The cell-door frame inspections and repairs were completed on March 30, 2011, and the Facility-wide searches (related to the modified program) resumed the next day.  (ECF No. 44-7 at 10.)

33. On April 13, 2011, staff completed the contraband searches in Facility C.  (ECF No. 44-7 at 10.)

34.  During the search, seventeen additional weapons, metal stock, inmate notes (kites), and other dangerous contraband were removed from the inmate population.  (ECF No. 44-7 at

---

[4]  Defendants provided detailed evidence concerning the volatile relationship between African-American prison gangs and disruptive groups in California prisons, which plaintiff does not dispute, and which is set forth at ECF No. 44-2 at 10-12.

10.)

35.  Based on the results of the search, Facility C's entire inmate population was released from the modified program, with the exception of its African-American inmates.  (ECF No. 44-7 at 10.)

36.  Additional interviews with influential members of each disruptive group were conducted in response to the intelligence concerning unrest between the disruptive groups and the tension with nonaffiliated African-American inmates.  (ECF No. 44-7 at 10.)

37.  Also in April 2011, an African-American inmate provided reliable intelligence suggesting that the February 19, 2011 attempted murder was not due to any hostility between African-American inmates and correctional staff.  (ECF No. 44-7 at 10.)

38.  The informant suggested that the attack was instead a misdirected attempt at retaliation; the offending inmate had exited his cell intending to stab a rival Crip inmate, but the correctional officer got in the way, and the inmate decided to stab the officer instead.  (ECF No. 44-7 at 10.)

39.  On May 3, 2011, Warden McDonald ordered an incremental unlock, and select African-American inmates were allowed out to the main recreation yard in small groups. (ECF No. 44-7 at 10.)

40.  At first, correctional staff watched as groups of six African-American inmates from various disruptive groups were released onto Facility C's upper and lower yards during the morning and afternoon recreation sessions.  (ECF No. 44-7 at 10.)

41.  When these unlocks occurred without incident, the numbers were increased to 12 inmates per yard (upper and lower) on May 5, 2011.  (ECF No. 44-7 at 10-11.)

42.  Every six days thereafter, the number of inmates allowed out to the yards increased by six.  (ECF No. 44-7 at 11.)

43.  On May 17, 2011, after correctional staff had released 36 African-American inmates onto Facility C's lower and upper yards without incident (72 inmates total), Warden McDonald decided that the incremental unlock for Facility C's African-American inmates had been successful.  (ECF No. 44-7 at 11.)

9

44. Warden McDonald determined that there was no continuing security threat to staff, and he lifted the modified program order and returned Facility C's African-American inmates to normal programming the next day.  (ECF No. 44-7 at 11.)

45. Plaintiff was on modified programming from February 19, 2011, through May 13, 2011; he was confined to his cell twenty-four hours a day, without benefit of outdoor exercise. Plaintiff was deprived of all outside exercise for a period of 84 days.

46. Based on Captain Peddicord's updates, Warden McDonald did not believe that it was safe to return Facility C's African-American inmate population to normal programming at any time from February 19, 2011, to May 13, 2011, and he decided it was necessary to maintain the restrictions on outdoor recreation during that time.  (ECF No. 44-7 at 9.)

47. The risk associated with lifting a modified program prematurely is that further incidents of violence can occur.  (ECF No. 44-7 at 11.)  In Warden McDonald's experience, among all the activities that are suspended during a modified program, it is most difficult to determine when outdoor exercise privileges can be safely restored.

48. Warden McDonald believed that following a phased unlock, violence was most likely to occur on an exercise yard.  Exercise yards are where most violent assaults occur, and inmates usually outnumber staff by a factor of 30 to 1.  Inmates have the greatest access to each other and to correctional staff on the exercise yards.  (ECF No. 44-7 at 11.)

49. To the extent that Plaintiff claims he should have been allowed to use the small concrete yards for exercise during the modified program period, several other African-American inmates from Facility C made this same request.  (ECF No. 44-7 at 12.)

50. This was not an option in Warden McDonald's view for at least several reasons. (ECF No. 44-7 at 12.)  First, from the time that HDSP opened in 1995, to present, the concrete yards have never been used for general population programming; they were only designed for, and have only been used by, Administrative Segregation Overflow and Security Housing Unit inmates.  (ECF No. 44-7 at 12.)  Second, given the number of inmates who were subject to the modified program, and the fact that the concrete yards (which are about the size of a basketball court) could probably only hold 10-20 inmates at any given time, an exercise program in the

10

1    concrete yards would have needed to be running continuously (24-hours each day) to

2    accommodate everyone.  (ECF No. 44-7 at 12.)  This would have interfered with the ongoing

3    investigation, and logistically, it was not reasonable or feasible under the conditions.  (ECF No.

4    44-7 at 12.)  Third, placing 10-20 Level IV inmates -- affiliated and non-affiliated, and from

5    separate gangs and disruptive groups -- in an enclosed space the size of a basketball court could

6    have been disastrous.  (ECF No. 44-7 at 12.)  If an inmate were assaulted by another inmate or

7    group of inmates on a recreation yard, he could at least run from the danger.  (ECF No. 44-7 at

8    12.)  But if an inmate were attacked in one of the enclosed concrete yards, he would have

9    no means of escape; he would be trapped.  As the Warden, Warden McDonald was responsible

10   for protecting the inmates in his custody, and he would never have subjected any inmates in his

11   care to this unreasonable risk of harm.  (ECF No. 44-7 at 12.)

12        51.  Finally, to the extent that conflicts might have been minimized by dividing Facility

13   C's African-Americans by gang and disruptive group, or by affiliated and non-affiliated status,

14   and allowing them to use the concrete yards in segregated groups, this segregation would not

15   have been sound penologically, and Warden McDonald did not allow it at HDSP for several

16   reasons.  (ECF No. 44-7 at 12.)  General population inmates are expected to program successfully

17   with other inmates of diverse races and ethnicities, as well as with inmates of differing street gang

18   affiliation.  (ECF No. 44-7 at 12.)  This is one of CDCR's core rehabilitative functions.  (ECF No.

19   44-7 at 12-13.)  Inmates already self-segregate along various racial and ethnic dimensions, but

20   Warden McDonald was unwilling to allow HDSP to perpetuate this practice, which would have

21   run counter to HDSP's programming goals.  (ECF No. 44-7 at 13.)

22        52. Warden McDonald knew that other institutions, like Kern Valley State Prison, had

23   experimented with programming in the concrete yards with negative results.[5]  (ECF No. 44-7 at

24   13.)  Where this practice has been tried, Warden McDonald knew that in some instances,

25   after the inmates became accustomed to recreating exclusively with their own racial, ethnic, or

26   _____

27   [5]  Plaintiff denies this statement, citing his declaration in which he explains his personal
     experience at Pelican Bay State Prison.  (ECF No. 54-1 at 29, citing  53-1 at 3.)  However,
     plaintiff has no personal knowledge of what Warden McDonald knew, and cites to no competent
28   evidence controverting the Warden's statement concerning Kern Valley State Prison.

prison disruptive group in the concrete yards, they refused to program with inmates of other races, ethnicities, and disruptive groups in the main exercise yards once the modified program was lifted, and that levels of violence actually increased when the inmates were returned to integrated programming.  (ECF No. 44-7 at 13.)  Warden McDonald knew through personal experience that when inmates are allowed to use the concrete yards in segregated groups (whether by race or gang affiliation), they become complacent in that routine -- they believe that they will be safe if allowed to program exclusively with members of their race or gang affiliation -- and they lose all incentive to work towards normal programming, which, of course, is optimal for rehabilitative purposes.  (ECF No. 44-7 at 13.)

53.  As executive-level officials who routinely advised Warden McDonald about the modified program daily, Defendants Davey, Gower, and Hitt would not have recommended a segregated exercise program in the concrete yards for many of these same reasons.  (ECF Nos. 44-3 at 10-11; 44-5 at 10-11.)

54.  All restrictions imposed on inmate access to the main exercise yards during modified programming were imposed with the belief that the restrictions would be effective in preventing further acts of violence, and would help to restore order.  (ECF Nos. 44-3 at 11; 44-5 at 11; 44-6 at 3; 44-7 at 15.)

55.  Based upon the reports they received, Warden McDonald and his executive staff, including defendants Davey, Gower, and Hitt, believed that the modified program at issue:  (1) was necessary to protect the lives of correctional staff and inmates because of significant and credible threats of continued violence; (2) was a response to severe and unusually high levels of violence at the prison; (3) was designed solely to protect the lives and safety of inmates and correctional staff members, who I believed were in imminent danger of violent assaults; (4) did not last any longer than was necessary to protect the lives and safety of inmates and correctional staff; (5) was not intended to prejudice or harass anyone; and (6) did not violate any statutory or constitutional rights.[6]  (ECF Nos. 44-3 at 12; 44-5 at 12; 44-6 at 4; 44-7 at 16.)

---

[6]  Plaintiff denies these facts, "generally" citing various paragraphs in his own declaration.  (ECF No. 54-1 at 30.)  However, in his deposition, plaintiff conceded that he had no personal

56. Plaintiff has no personal knowledge about the security threats that Warden McDonald and his executive staff were aware of when they were making decisions and recommendations concerning the modified program. (ECF No. 44-4 at 13-14; 18-19; 41; 42-43; 45-46.) When asked in his deposition if "the entire basis of [his] knowledge of the modified program [] came from the program status reports," plaintiff responded, "yes." (ECF No. 44-4 at 19.)

57. Defendants Davey and Gower were "always cognizant" that inmates have a right to outdoor exercise, but the safety and security of the institution, staff, and inmates took precedence over all other considerations, and striking the right balance between ensuring safety and returning inmates to regular exercise and normal programming as soon as safely possible is difficult. (ECF Nos. 44-3 at 8; 44-5 at 8.)

58. Defendants Davey and Gower always believed that every modified program should end as quickly as safely possible, and recommended to the Warden that the restrictions on activities be lifted as soon as they believed it was safe to restart normal programming activities. (ECF Nos. 44-3 at 8; 44-5 at 8.)

59. Defendant Hitt believed that all restrictions imposed during the modified program were necessary to prevent further acts of violence and restore order, and the consequences for failing to act could have been dire. (ECF No. 44-6 at 3.)

C. Discussion

    i. 42 U.S.C. § 1983 Causation

        a. Legal Standard

Section 1983 provides a cause of action against any person who, under color of state law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

knowledge concerning the alleged threats discovered during the investigation, or what information the defendants gave to the Warden, or what specific recommendations were made to the Warden. (ECF No. 44-4 at 41, 45-46.) Plaintiff offers no competent evidence to refute the facts contained in paragraph 55.

1    which he is legally required to do that causes the deprivation of which complaint is made."

2    Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  "In a § 1983 action, the plaintiff must also

3    demonstrate that the defendant's conduct was the actionable cause of the claimed injury.  To meet

4    this causation requirement, the plaintiff must establish both causation-in-fact and proximate

5    causation."  Harper v. City of L.A., 533 F.3d 1010, 1026 (9th Cir. 2008) (internal citations

6    omitted).  Proximate cause requires "'some direct relation between the injury asserted and the

7    injurious conduct alleged.'"  Hemi Group, LLC v. City of New York, 559 U.S. 1, 130 S. Ct. 983,

8    989, 991 (2010) (quoting Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

9                                          b.  Findings

10       As employees of CDCR, defendants acted under color of state law in executing the duties

11   of their positions relating to the implementation and continuation of lockdowns at HDSP.

12       Defendants argue that judgment should be in favor of defendants because they did not

13   cause plaintiff's alleged injury as required for § 1983 liability, since they did not control the

14   duration or scope of the modified program.  It is undisputed that Warden McDonald, who is not a

15   named defendant, had sole authority to implement, modify or terminate the modified program.

16       However, by their participation in the meetings concerning the modified program,

17   defendants Gower, Davey and Hitt "participate[d] in [the warden]'s affirmative acts," through

18   giving advice, expertise and recommendations to enable the Warden to approve of the scope and

19   duration of the lockdown.  See Duffy, 588 F.2d at 743-44 ("The requisite causal connection can

20   be established not only by some kind of direct personal participation in the deprivation, but also

21   by setting in motion a series of acts by others which the actor knows or reasonably should know

22   would cause others to inflict the constitutional injury.").  Defendants Davey and Gower reviewed

23   the programming recommendations and evidence provided by subordinate staff, and evaluated the

24   ongoing need for the February 19, 2011 modified program; attended numerous threat assessment

25   meetings in which the modified program, the status of the investigation, the threats to safety and

26   security in Facility C and the institution generally were discussed; and provided Warden

27   McDonald with opinions and recommendations concerning the modified program.  (ECF No. 44-

28   3 at 2; ECF No. 44-5 at 2.)  In addition, weekly mandatory meetings were held with the Warden.

                                              14

1   Defendants Davey, Gower, and Hitt attended several of these meetings.  When defendants Davey

2   and Gower had something to offer, each provided the Warden with information and advice about

3   the progress of the investigation, the status of the modified program, any further incidents of

4   violence, and the development of a plan to resume normal programming.  (ECF No. 44-3 at 7;

5   ECF No. 44-5 at 7.)  Defendant Hitt briefed the Warden on the progress of the investigation, the

6   efforts at returning Facility C to normal programming, and whether any changes to the modified

7   program's terms were appropriate in light of security conditions at the time.  (ECF No. 44-6 at 3.)

8   Thus, the input of defendants Gower, Davey and Hitt were a part of Warden McDonald's

9   decision-making process to implement and continue the lockdown.  See Duffy, 588 F.2d at 743.

10  Indeed, Warden McDonald declared that he relied on the investigations, analysis, and opinions of

11  his staff.  (ECF No. 44-7 at 3.)  Accordingly, the conduct of defendants Gower, Davey and Hitt

12  sufficiently satisfies the causation requirement for section 1983.

13         On the other hand, defendant Speers had no similar involvement with the Warden.

14  Defendant Speers was not a member of the Warden's executive staff, and he did not attend any of

15  the weekly meetings held in connection with the modified program, and did not provide the

16  Warden or any member of his executive staff with input regarding the modified program or the

17  related investigation.  (ECF No. 44-8 at 2-3.)  Plaintiff offered no evidence to the contrary.

18  Therefore, defendant Speers should be granted summary judgment.

19                        ii.  Eighth Amendment Claim

20                    a.  Legal Standards

21         The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S.

22  Const. amend. VIII.  The "unnecessary and wanton infliction of pain" constitutes cruel and

23  unusual punishment prohibited by the United States Constitution.  Whitley v. Albers, 475 U.S.

24  312, 319 (1986).  Neither accident nor negligence constitutes cruel and unusual punishment, as

25  "[i]t is obduracy and wantonness, not inadvertence or error in good faith, that characterize the

26  conduct prohibited by the Cruel and Unusual Punishments Clause."  Whitley, 475 U.S. at 319.

27  What is needed to show unnecessary and wanton infliction of pain "varies according to the nature

28  of the alleged constitutional violation."  Hudson v. McMillian, 503 U.S.1, 5 (1992) (citing

                                        15

Whitley, 475 U.S. at 320).  To prevail on an Eighth Amendment claim, the plaintiff must show,

objectively, that he suffered a "sufficiently serious" deprivation.  Farmer v. Brennan, 511 U.S.

825, 834 (1994); Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).  The plaintiff must also show

that each defendant had, subjectively, a culpable state of mind in causing or allowing plaintiff's

deprivation to occur.  Farmer, 511 U.S. at 834.  Thus, prison officials may be held liable under

the Eighth Amendment for denying humane conditions of confinement only if they know that

inmates face a substantial risk of harm and they disregard that risk by failing to take reasonable

measures to abate it.  Id. at 847.  However, defendants may be entitled to summary judgment if

the prison officials had "reasonable" justification for the deprivations, in spite of that risk.

Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010), citing Farmer, 511 U.S. at 844 ("Prison

officials who actually knew of a substantial risk to inmate health or safety may be found free from

liability if they responded reasonably.").

Outdoor exercise is a basic human need protected by the Eighth Amendment, and the

denial of outdoor exercise may violate the Constitution, depending on the circumstances.

Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010); Norwood v. Vance, 591 F.3d 1062, 1070

(9th Cir. 2010).  While the "temporary denial of outdoor exercise with no medical effects is not a

substantial deprivation," Vance, 591 F.3d at 1070 (internal quotation and citation omitted), when

an inmate alleges the denial of constitutionally adequate outdoor exercise, the inquiry is fact

specific.  In determining whether a deprivation of outdoor exercise is sufficiently serious, the

court must consider the circumstances, nature, and duration of the deprivation.  Spain v.

Procunier, 600 F.2d 189, 199 (9th Cir.1979).

The Ninth Circuit has clarified the elements necessary to state a deprivation that would

rise to the level of an Eighth Amendment violation:

> An Eighth Amendment claim that a prison official has deprived
> inmates of humane conditions must meet two requirements, one
> objective and one subjective. Allen v. Sakai, 48 F.3d 1082, 1087
> (9th Cir. 1995). "Under the objective requirement, the prison
> official's acts or omissions must deprive an inmate of the minimal
> civilized measure of life's necessities. The subjective requirement,
> relating to the defendant's state of mind, requires deliberate
> indifference." Id. (citations omitted).

1    Lopez v. Smith, 203 F.3d 1122, 1132-33 (9th Cir. 2000).  Nevertheless, "the Ninth Circuit has not

2    identified a specific minimum amount of weekly exercise that must be afforded" under the Eighth

3    Amendment."  Jayne v. Bosenko, 2009 WL 4281995, at *8 (E.D. Cal. Nov.23, 2009) (citation

4    omitted).  Indeed, complete denial of outdoor exercise for a month is not unconstitutional.

5    Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir. 1980) (denial of yard time for a month not

6    unconstitutional); May v. Baldwin, 109 F.3d 557, 565-66 (9th Cir. 1997) (denial of yard time for

7    21 days not unconstitutional).  However, in Lopez, the Ninth Circuit found that plaintiff's claim

8    that he was denied all outdoor exercise for six and a half weeks met the objective requirement for

9    an Eighth Amendment claim.  Lopez, 203 F.3d at 1132-33.  Furthermore, for a temporary denial

10    of exercise to be actionable, plaintiff must demonstrate an adverse medical impact.  Id., 203 F.3d

11    at 1133 n.15 ("the clear implication of May is that temporary denials of outdoor exercise must

12    have adverse medical effects to meet the Eighth Amendment test, while long-term deprivations

13    are substantial regardless of effects.").

14                        b.  Discussion

15       It is undisputed that plaintiff was denied all outdoor exercise for 84 days, a period of 12

16    weeks.

17       In Hayward, the Ninth Circuit concluded that denying inmates at San Quentin yard

18    exercise for a month during a lockdown did not violate the Eighth Amendment, where "the

19    lockdown was in response to a genuine emergency" in which 84 assaults with weapons, 12

20    killings, 71 cases of possession of weapons, and 2 attempted escapes, took place at the prison

21    within a single year.  Id., 629 F.2d at 603.  The Ninth Circuit has since clarified that ordinary

22    prison violence does not constitute an "emergency" that renders long periods of lockdown

23    constitutional.  Thomas, 611 F.3d at 1154 ("Documented threats and assaults happen frequently

24    in prisons.  Given that an emergency is different from normal prison conduct, an emergency

25    cannot be deemed to exist simply because there are documented threats and assaults from time to

26    time -- otherwise every prison would be in a constant state of emergency.").

27       Assuming that the threats that came to light during the investigation following the

28    February 18, 2011 attack did not rise to the level of a "state of emergency" at HDSP, the court

1   analyzes this case according to <u>Thomas</u>:  First, the court must determine whether the deprivation

2   was "sufficiently serious" to support an Eighth Amendment claim.  Under the circumstances here,

3   the answer is yes.  The length of time that plaintiff was denied all outdoor exercise, 84 days or 12

4   weeks, renders his deprivation objectively serious under existing law.  <u>See</u> <u>Thomas</u>, 611 F.3d at

5   1151 (six-week prohibition on outdoor exercise is "sufficient serious" to support constitutional

6   claim).  In <u>Allen</u>, 48 F.3d at 1087-89, a prisoner alleged that for six weeks he was only permitted

7   forty-five minutes of outdoor exercise a week.  <u>Id.</u>  The court denied defendants' motion for

8   summary judgment finding that the plaintiff had satisfied the objective requirement of the Eighth

9   Amendment analysis by claiming he was deprived of a basic human need.  <u>Id.</u>  Here, plaintiff

10  alleges he was completely denied any outdoor exercise for over two times the deprivation period

11  in <u>Allen</u>.  Accordingly, this court finds that plaintiff was deprived of something sufficiently

12  serious to satisfy this objective requirement.

13      Second, the court must determine whether the risk to plaintiff was sufficiently "obvious"

14  to prison officials that they must have been aware of the severity of the deprivation.  <u>Thomas</u>, 611

15  F.3d at 1151.  Here, as in <u>Thomas</u>, it is undisputed that the Warden and defendants knew the

16  length and scope of Facility C inmates' confinement without outdoor exercise.  <u>Id.</u> at 1152.  State

17  regulations mandated regulating outdoor exercise for inmates, and "case law uniformly stresses

18  the vital importance of exercise for prisoners."  <u>Id.</u>; <u>see also</u> ECF No. 53 at 17, citing Cal. Code

19  Regs. tit. 15 §§ 1065, 3322, 3343(h) (2011).  The Ninth Circuit concluded that, as a matter of law,

20  prison officials were aware "of the potential consequences of depriving an inmate of out-of-cell

21  exercise for an extended period of time."  <u>Thomas</u>, 611 F.3d at 1152.  Such reasoning applies

22  under the circumstances here.

23      Third, the court considers whether prison officials acted "reasonably" in depriving

24  plaintiff of outdoor exercise for an extended length of time.  Factors to be considered include "the

25  serious risk to [plaintiff's] mental and physical health; the level of documented assaults and

26  threats at the facility during the [period] [plaintiff] was deprived of exercise; . . . and the prison

27  authorities' failure to consider providing him with alternative opportunities to exercise."  <u>Thomas</u>,

28  611 F.3d at 1153.

Defendants have offered evidence that the February 19, 2011 attempted murder of a staff member was extraordinary, even by prison standards, requiring investigators to determine whether the assault was an isolated incident or the beginning of a coordinated campaign of violence, involving many inmates. During the attack, numerous African-American inmates refused orders to "get down," and were seen throwing weapons underneath cell doors within the section. Warden McDonald immediately placed all African-American general population inmates at HDSP on modified program following the attempted murder. Prison staff began an investigation during which they discovered dozens of additional security threats, each of which required further investigation. On February 28, 2011, after learning that the security threat was limited to Facility C, Warden McDonald lifted the restrictions on Facilities A and D, but the modified program remained in effect on Facility C. During the investigation, staff learned of ongoing tension between members of Facility C's Bloods and Crips, and that it was unsafe to release members of the two disruptive groups into a shared space. Intelligence also revealed that the tension was not limited to members of these disruptive groups, but also included members of the Kumi 415 (an African-American disruptive group from the Bay Area), as well as Facility C's non-affiliated African-American inmates. On March 23, 2011, it was learned that weapons were being hidden in specific cell door frames in Facility C. Subsequent searches resulted in the discovery of 27 weapons and metal stock, inmate notes (kites), and other dangerous contraband. According to defendants' evidence, the modified program was extended by the discovery of a large amount of weapons, the time it took to interview staff and inmates, as well as the potential threat posed by the tension between the disruptive groups identified during the investigation. Despite the delay, the Warden implemented incremental adjustments to the modified program as appropriate. The Warden repeatedly instructed his staff that the objective was to return to normal programming as soon as it was safe to do so.

Based on the defendants' undisputed evidence, the undersigned concludes that defendants met their burden to cite evidence in support of their assertion that there is no genuine dispute of material fact as to whether defendants were deliberately indifferent, as implementing the modified

////

1   program was "reasonable."[7]  See Thomas, 611 F.3d at 1150-51.

2          Therefore, the burden shifts to plaintiff to establish that a genuine issue of material fact

3   exists as to defendants' deliberate indifference.  A plaintiff's verified complaint may be

4   considered as an affidavit in opposition to summary judgment if it is based on personal

5   knowledge and sets forth specific facts admissible in evidence.  Lopez, 203 F.3d at 1132 n.14.  In

6   the amended complaint, plaintiff claims that during the 84 day denial of outdoor exercise, he

7   suffered physical injury from the deprivation, and alleges that defendants failed to consider

8   providing him alternative options for exercise during the extended modified program.  Plaintiff

9   also claims there were concrete yards adjacent to Facility C that could have been used for outside

10  exercise during the modified program.

11         In addition, plaintiff provided records of his 602 inmate appeals of the modified program

12  at HDSP.  (ECF No. 15 at 9-18.)  In Log No. HDSP-11-00594, signed April 5, 2011, plaintiff

13  argued that prison officials had authority to allow him access to the concrete yards during the

14  modified program, and that he needed access to maintain a healthy life.  (ECF No. 15 at 9.)

15  Plaintiff noted that federal courts have stated that such conduct violates the Eighth Amendment,

16  the concrete yards were not being used, and that plaintiff had pain in his lower back due to this

17  deprivation.  (ECF No. 15 at 11.)  Plaintiff was interviewed on May 9, 2011, by defendant Speers

18  regarding the first level appeal.  In the first level appeal response, defendant Davey cited various

19

20  [7]  Counsel for defendants argue in their reply that Warden McDonald did consider the possibility of running an exercise program in the concrete yard but rejected this option.  (ECF No. 58 at 8.)

21  However, the Warden's declaration does not state that during the modified program he considered the concrete yard as an outdoor exercise option for inmates subject to the modified program.

22  Rather, the declarations of the Warden and defendants Gower and Davey state that they "have been advised" that plaintiff claims he should have been allowed to use the small concrete yards

23  for exercise during the modified program (ECF Nos. 44-3 at 9; 44-5 at 9; 44-7 at 12), and then discuss why it was not a feasible option, why Warden McDonald "would not have allowed it,"

24  and why defendants Gower and Davey "would not have recommended it."  Id.  It is unclear exactly when the Warden and defendants were "advised" of plaintiff's claims or when they

25  considered the feasibility of this option.  But a fair reading of the declarations provided by the Warden and defendants Gower, Davey, and Hitt demonstrates their belief that the staff attack on

26  February 19, 2011, the threats uncovered in the subsequent investigation, as well as the 27

27  weapons discovered during the searches, warranted the modified program for the safety and security of the staff and inmates, despite the denial of outdoor exercise.

28

prison regulations explaining the nature of lockdowns, how access to yard, recreation and

entertainment activities would be limited "only by security needs," but that "[t]he requirement of

custodial security and of staff, inmate and public safety must take precedence over all other

considerations in the operation of all the programs . . . of the institutions of the department."

(ECF No. 15 at 17-18.)  Defendant Davey then stated:  "Inmate Arline, High Desert State Prison

is not staffed to provide coverage for inmate use of the concrete yard on Facility C, therefore, the

facility concrete yards are not authorized for use for yard activities.  Your request for access to

concrete yard is denied."  (ECF No. 15 at 18.)

Plaintiff appealed the first level denial, stating that there was an alternative to outdoor

exercise during modified programs, the concrete yards.  (ECF No. 15 at 10.)

In the second level appeal response, issued June 21, 2011, defendant Gower stated:

> On June 2, 2011, Correctional Lieutenant D. Hitt completed a
> review of your appeal and its attachments.  During the review, Lt.
> Hitt found that the first level response regarding your appeal was
> appropriate and fully explained the reasons why HDSP will not
> implement such an exercise yard program.  Based on the current
> financial status of the State of California and the California
> Department of Corrections and Rehabilitation, the Department has
> been forced to implement a Staff Redirect Plan to accomplish salary
> savings throughout the Department.  This results in staff being
> redirected from their respective post, to a post on another facility,
> on a daily rotational basis.  This results in program closures for the
> different facilities on a rotational schedule.  In addition, there is
> insufficient staffing to accomplish implementing an additional
> exercise yard program for inmates on lockdown, such as a concrete
> yard.  To implement such a program would require additional
> staffing, resulting in added expense and further impact to the
> already overwhelming financial burden of the Department.

(ECF No. 15 at 15.)  Defendant Gower then quoted the regulation defining lockdowns.

Defendant Gower explained that

> the Black inmate population was placed on a modified program, in
> order to conduct the necessary interviews of that population in an
> effort to identify any further plans to assault correctional staff.  The
> modified program was also necessary to allow staff to complete
> searches of the entire facility in an effort to locate any additional
> inmate manufactured weapons or weapon stock materials.  These
> steps were necessary to ensure the safety of staff, inmates and the
> security of the institution.  On May 18, 2011, these steps were
> completed and a Facility C Threat Assessment was submitted
> indicating that there appeared to be no further threats of violence
> towards  correctional  staff  by  the  Facility  C  Black  inmate

1

2

3

4

> population.  The Black inmate population was then released from the modified program and returned to normal program.  At this time, the Black inmate population is currently still participating in a normal program on Facility C.  [¶] Therefore, your request for Facility C to implement a concrete exercise yard program for inmates who are on lockdown is denied.

5   (ECF No. 15 at 16.)  On September 19, 2011, plaintiff's appeal was denied at the third level.

6   (ECF No. 15 at 13.)

7       The court turns now to plaintiff's opposition to the motion for summary judgment.  As

8   noted by defendants, plaintiff submitted only his own declaration, and portions of his declaration

9   are not useful because his statements are not based on matters within his own personal

10  knowledge.  However, defendants did not address the comments made by defendants Davey and

11  Gower during the administrative appeal process stating that the concrete yards could not be used

12  during lockdowns because of insufficient staffing or the expense of obtaining additional staff.

13  Plaintiff argues that defendants placed inconsequential logistical concerns above plaintiff's need

14  for exercise (ECF No. 53 at 15), and relies on Allen v. Sakai, 48 F.3d 1082 (9th Cir. 1994),

15  throughout his opposition.  (ECF No. 53, *passim*.)

16      In Allen, the Ninth Circuit stated:

17

18

19

20

21

22

23

24

25

26

27

> The defendants attempt to excuse the deprivation by explaining that logistical problems made it difficult to provide adequate exercise. According to the defendants, scheduling an inmate's time in the exercise yard was difficult because, for security reasons, inmates had to be accompanied to the recreation yard by a guard and only one inmate could use the recreation yard at a time. We recognize that the practical difficulties that arise in administering a prison facility from time to time might justify an occasional and brief deprivation of an inmate's opportunity to exercise outside. However, we cannot accept the defendants' vague reference to logistical problems as necessarily justifying, as a matter of law at the summary judgment stage, the deprivation that took place here. A rational fact-finder after hearing the evidence might determine that the defendants acted with at least deliberate indifference to Smith's basic human needs, as defined by Spain, by placing inconsequential logistical concerns that might be no more than matters of convenience above Smith's need for exercise. See Harris v. Angelina County, 31 F.3d 331, 335-36 (5th Cir. 1994) (practical difficulties to mitigating prison overcrowding did not establish as a matter of law that prison officials had not acted with deliberate indifference when officials were aware of the conditions and had available alternative avenues to address the conditions).

28

1    Allen, 48 F.3d at 1088.

2           Allen differs from the instant case because Allen's deprivation was the result of his

3    confinement in the Segregated Housing Unit, where his incarceration was "indefinite and

4    therefore potentially long-term" id., rather than as a result of a modified program implemented

5    following an attack on prison staff.  However, in Allen the Ninth Circuit affirmed the district

6    court's denial of qualified immunity where Allen was allowed only forty-five minutes of outdoor

7    exercise per week for period of six weeks.  Here, plaintiff was denied all outdoor exercise for

8    twelve weeks, which is an extended period.

9           Finally, while defendants' actions may have been reasonable to address their safety and

10   security concerns, defendants do not show any act aimed to provide inmates subject to the

11   modified program with outdoor exercise during this extended modified program.  Spain, 611 F.3d

12   at 200 (even where security concerns might justify a limitation on permitting a prisoner "to

13   mingle with the general prison population," such concerns "do not explain why other exercise

14   arrangements were not made.")

15          Accordingly, in light of all of the above, the undersigned concludes that plaintiff has

16   raised a genuine dispute of fact as to whether defendants Davey, Gower and Hitt violated

17   plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

18                          iii.  Qualified Immunity

19          "The doctrine of qualified immunity protects government officials from liability for civil

20   damages insofar as their conduct does not violate clearly established statutory or constitutional

21   rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231

22   (2009).  The defendant bears the burden of establishing qualified immunity.  Crawford-El v.

23   Britton, 523 U.S. 574, 586-87 (1998).  The Supreme Court, in Saucier v. Katz, 533 U.S. 194

24   (2001), outlined a two-step approach to qualified immunity.  The first step requires the court to

25   ask whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts

26   alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201.  The

27   second inquiry is whether the right was clearly established; in other words, "whether it would be

28   clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.  In

1  Pearson, supra, 555 U.S. 223, the Supreme Court gave district courts discretion to grant qualified

2  immunity on the basis of the "clearly established" prong alone, without deciding in the first

3  instance whether any right had been violated.  Id. at 236; accord Ashcroft v. al-Kidd, 131 S. Ct.

4  2074, 2080 (2011).

5          As discussed above, the Court has found that there is a triable issue regarding whether the

6  modified program was continued with deliberate indifference to plaintiff's right to outdoor

7  exercise.  Thus, the second prong requires the court to determine if the law was clearly

8  established at the time plaintiff was subjected to the modified program.

9          In Noble, first issued on March 17, 2011, and amended on August 2, 2011, the Ninth

10  Circuit determined that prison officials were entitled to qualified immunity with respect to a

11  seven-month lockdown following a prison riot, as

12              it was not clearly established in 2002 -- **nor is it established yet** --
             precisely how, according to the Constitution, or when a prison
13              facility housing problem inmates must return to normal operations,
             including outside exercise, during and after a state of emergency
14              called in response to a major riot, here one in which inmates
             attempted to murder staff.
15

16  Noble v. Adams, 646 F.3d 1138, 1143 (9th Cir. 2011) (emphasis added); see also Mitchell v.

17  Cate, 2014 WL 546338, *17, n.8 (E.D. Cal. Feb.11, 2014) (collecting cases about the lack of

18  consensus on this issue).  Similarly, district courts have found that "[i]t is not clearly established

19  exactly how or when prison officials must lift a lockdown or modified program implemented in

20  response to threats to the safety and security of the institution arising from riots or information

21  that inmates plan to assault staff."  Norwood v. Cate, 2013 WL 1127604, *23 (E.D. Cal. March

22  18, 2013).  In Cate, the court found that:

23              In light of the undisputed evidence regarding the reasons for the
             lockdowns/modified programs, the investigatory steps undertaken
24              in responding to events, and that prison officials lifted
             lockdowns/modified programs in stages depending on the results of
25              the investigations, it would not have been clear to a reasonable
             officer that restricting an inmate's outdoor exercise in conjunction
26              with the lockdowns/modified programs during investigations at
             issue here was unlawful. Therefore Defendants are entitled to
27              qualified immunity for the lockdowns [at issue].

28

Id. Here, on a similar record, and in the absence of established law clarifying at what point, and under what circumstances, a security-based lockdown becomes unconstitutional, the undersigned concludes that defendants are entitled to qualified immunity.

III.  Recommendation

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Defendant Speers is entitled to summary judgment based on plaintiff's failure to demonstrate causation; and

2.  Defendants Davey, Gower, Hitt, and Speers are entitled to qualified immunity as to plaintiff's Eighth Amendment claims; therefore, defendants' motion for summary judgment (ECF No. 44) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  July 23, 2014

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

arli3414.msj

25